12-2071.131-RSK                                    February 21, 2013

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SIDNEY FERENC, LEGACY RE, LTD.,    )
ROCK SOLID GELT LIMITED, and 407   )
DEARBORN, LLC,                     )
                                   )
            Plaintiffs,            )
                                   )
            v.                     )      No. 12 C 2071
                                   )
KAREN BRENNER, FORTUNA ASSET       )
MANAGEMENT, LLC, and MICHAEL       )
HORRELL,                           )
                                   )
            Defendants.            )


### MEMORANDUM OPINION

Before the court are: (1) the motion of defendants Karen
Brenner and Fortuna Asset Management, LLC ("FAM") to compel
arbitration; (2) the plaintiffs' motion to strike a portion of the
defendants' reply brief; and (3) defendant Michael Horrell's motion
to dismiss.  For the reasons explained below, we grant the
defendants' motion to compel arbitration in part and deny it in
part, deny the plaintiffs' motion to strike, and grant Horrell's
motion to dismiss.

### BACKGROUND

Plaintiffs Sidney Ferenc, Legacy Re, Ltd. ("Legacy Re"), Rock
Solid Gelt Limited ("Rock Solid"), and 407 Dearborn, LLC ("407
Dearborn") have sued the defendants for breach of fiduciary duty
and RICO fraud.  The plaintiffs allege that in 2005 Brenner

- 2 -

solicited Ferenc (through his company Legacy Re) to make a $2 million investment in Fortuna Stream, L.P. (Compl. ¶ 11.) Brenner is Fortuna Stream's general partner, and Legacy Re is a limited partner. (<u>Id.</u>) Brenner is also the managing member of FAM. (<u>Id.</u> at ¶ 7.) In 2006, Ferenc, Legacy Re, and Rock Solid (another company in which Ferenc holds an interest) entered into "Investment Management Performance Fee Agreements" (hereinafter, "Investment Management Agreements") with FAM. (<u>See</u> <u>id.</u> at ¶ 12; <u>see also</u> Investment Management Agreements, attached as Exs. 1-3 to Decl. of Karen Brenner.)[1] Pursuant to these agreement, FAM agreed to provide "investment management services and advice" to Ferenc, Legacy Re, and Rock Solid. (Compl. ¶ 12.) Among other things, FAM established an account at Bear Stearns, in Ferenc's name and for his benefit, over which FAM exercised "discretionary trading authority." (<u>Id.</u>)

In 2006, Brenner and FAM advised and encouraged Ferenc to acquire an interest in a $7.25 million loan that Fortuna Stream had made to a company called Scattered Corporation (the "Scattered Loan"). The Scattered Loan was secured in part by mortgages on the properties commonly known as 407 S. Dearborn, Chicago, Illinois (the "Dearborn Property") and 401 S. LaSalle Street, Chicago, Illinois (the "LaSalle Property."). (<u>Id.</u> at ¶ 14.) The Dearborn

---

[1] The terms of the three agreements are virtually identical and each is dated "as of" June 1, 2006.

- 3 -

Property was then owned by Old Colony Partners Limited Partnership ("Old Colony") and the LaSalle Property was then owned by 401 Properties Limited Partnership ("401 Properties"). (Id. at ¶ 16.) The plaintiffs allege on information and belief that defendant Michael Horrell had a direct or indirect interest in both properties. (Id. at ¶ 17.) Ferenc (through Legacy Re) purchased one interest in the loan from Fortuna Stream for $450,000 and another interest (through Rock Solid) from ACF Property Management, Inc. for $3.8 million. (Id. at ¶ 15.) The plaintiffs allege on information and belief that AFC Property Management was owned or controlled by Alan Fox, another investment client of Brenner and FAM. (Id.) Scattered Corporation later defaulted on the loan, precipitating another series of transactions. (Id. at ¶ 18.) First, the Dearborn Property was conveyed to a newly-created entity, plaintiff 407 Dearborn. (Id.) Initially, Rock Solid and Legacy Re were members of 407 Dearborn along with Fortuna Stream and affiliates of FAM, and the company was managed and controlled by Brenner, FAM, "and/or" Horrell (directly or indirectly through a company called 407 Dearborn Manager, LLC). (Id. at ¶¶ 18-19.) In June 2011, Rock Solid acquired all of the interests in 407 Dearborn and an affiliate of Rock Solid and/or Ferenc assumed control and management of the company. (Id.) Second, 401 Properties executed a new promissory note in the amount of $3.2 million payable to Fortuna Stream (the "401 Note"). (Id. at ¶ 18.)

- 4 -

On September 22, 2009, Fortuna Stream assigned to Legacy Re an undivided 6.206% interest in the 401 Note and assigned to Rock Solid an undivided 48.276% interest in the 401 Note. (Id.) Legacy Re and Rock Solid allege that they have "lost all or much of" their investment in the Scattered Loan and that they are "unlikely" to recoup their investments through the post-default transactions. (Id. at ¶¶ 26, 29.)

The plaintiffs have filed a four-count complaint against the defendants. In Count I, Legacy Re and Rock Solid allege that Brenner and FAM breached their fiduciary duty by failing to disclose the risks associated with the Scattered Loan transaction. (Id. at ¶ 23.) They further allege that they were encouraged to invest in the Scattered Loan in order to reduce the exposure of Fortuna Stream, Brenner, and other FAM clients, including Alan Fox. (Id. at ¶ 24.) In Count II, 407 Dearborn alleges that Brenner, FAM, and Horrell exercised their control over the company to cause it to enter into transactions that benefitted the defendants at the company's expense. (See id. at ¶¶ 34, 37 (alleging that the defendants caused the 407 Dearborn to pay excessive and unnecessary fees to Horrell and his affiliates); 35 (alleging that Brenner, FAM, and/or Horrell caused the company to accept and repay loans from the defendants or their affiliates at high interest rates).) In Count III, Ferenc alleges that Brenner and FAM breached their fiduciary duty to him by recommending investments in which they

- 5 -

(and Horrell) benefitted. (Id. at ¶ 44.) As we read the complaint, those investments included bonds that FAM traded on Ferenc's behalf. (See id. at ¶ 46.) Finally, in Count IV, Ferenc, Legacy Re, and Rock Solid allege that Brenner and Horrell violated the civil RICO statute. (Id. at ¶¶ 49-60.)[2]

## DISCUSSION

Brenner and FAM have moved to compel the plaintiffs to submit their claims to arbitration pursuant to arbitration clauses in the Investment Management Agreements. Horrell, who is not a party to the Investment Management Agreements, has moved to dismiss the claims against him under Rule 12(b)(6).

**A.  Brenner's and FAM's Motion to Compel Arbitration**

**1.  Legal Standard**

The arbitration clauses in the Investment Management Agreements designate Orange County, California as the forum for arbitration. (See Investment Management Agreement ¶ 20.) We cannot compel arbitration in a forum outside the Northern District of Illinois. See Federal Arbitration Act ("FAA"), 9 U.S.C. § 4; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer, 49 F.3d 323, 327 (7th Cir. 1995) ("[T]his Circuit has concluded that where the arbitration agreement contains a forum selection clause, only the

---

[2]/ The heading of Count IV does not identify which plaintiffs are joining the civil RICO claim, but it is apparent from the complaint's allegations that it is brought by Ferenc, Legacy Re, and Rock Solid. (See Compl. at 16 ("WHEREFORE, Ferenc, Legacy Re and Rock Solid pray for entry of judgment in their favor and against Karen Brenner and Michael Horrell jointly and severally . . . .").)

- 6 -

district court *in that forum* can issue a § 4 order compelling arbitration.") (emphasis in original). Neither side has cited <u>Merrill Lynch</u> or otherwise acknowledged this limitation on our authority to compel arbitration. Rather than move to compel arbitration, Brenner and FAM should have moved to dismiss the claims against them for improper venue under Rule 12(b)(3). <u>See</u> <u>Continental Cas. Co. v. American Nat. Ins. Co.</u>, 417 F.3d 727, 733 (7th Cir. 2005). However, the central question in this case is the same whether we proceed under § 4 of the FAA or Rule 12(b)(3): did the plaintiffs agree to arbitrate the claims asserted in their complaint? <u>See</u> <u>id.</u> ("The central issue in this case is whether Continental agreed to arbitrate this dispute."). Therefore, in the interests of efficiency, we will convert the defendants' motion to compel arbitration into a motion to dismiss for improper venue. <u>See</u> Fed. R. Civ. P. 12(b)(3).

Under the FAA, an arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Whether the parties' dispute in this case is subject to arbitration is a question of contract interpretation. <u>See</u> <u>Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.</u>, 174 F.3d 907, 909 (7th Cir. 1999). However, the Supreme Court has interpreted the FAA to require that "any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration." Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); see also Kiefer, 174 F.3d at 909. "[A] court may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Kiefer, 174 F.3d at 909 (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).

Each of the Investment Management Agreements contains a broad arbitration clause: "[t]he parties agree that in the event of a dispute with respect to this Agreement or their respective obligations hereunder, such dispute shall be settled by arbitration in Orange County, California, in accordance with the rules of the American Arbitration Association." (See Investment Management Agreement ¶ 20); see also AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986) (describing a similar provision — "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder . . ." — as "broad"). Where, as here, the parties have adopted a broad arbitration clause, we will compel arbitration unless there is "forceful evidence" that the parties intended to exclude their grievance from arbitration. Warrior & Gulf Nav., 363 U.S. at 584-85; see also AT&T Tech., 475 U.S. at 650

- 8 -

(similar).[3] However, the federal policy favoring arbitration does not supplant the parties' intent as expressed in their agreement. See Stone v. Doerge, 328 F.3d 343, 345-46 (7th Cir. 2003).

**2. Counts I (Legacy Re and Rock Solid — Breach of Fiduciary Duty) and III (Ferenc — Breach of Fiduciary Duty)**

**a. Counts I and III Against FAM**

The plaintiffs argue that their claims are not disputes "with respect to" the Investment Management Agreements, relying on the following provision:

1. <u>Services</u>

(a) Client retains FAM to provide investment management services and to manage Client's securities in Client's investment account (the "Account"). Subject to Client's investment restrictions referred to in Section 3(a)(iii) below, Client grants to FAM full discretion as to all investment decisions regarding the Account, including, but not limited to, authority to buy, invest in, hold for investment, own, assign, transfer, sell (long or short), exchange, trade in, lend, pledge, deliver and otherwise deal in (on margin or otherwise) stocks, bonds, options, repurchase agreements, commodities and all other securities and intangible investment instruments and vehicles of every kind and nature ("Securities") for the Account, and to exercise, in FAM's discretion, all rights, power, privileges and other incidents of ownership with respect to Securities in the Account.

[. . .]

(b) FAM may also provide investment advice regarding other investment opportunities not involving the Account ("Other Services"). Other Services will primarily be for

---

[3] Although the cited cases involved labor disputes, the general principles apply equally to ordinary commercial disputes. See Schacht v. Beacon Ins. Co., 742 F.2d 386, 390 (7th Cir. 1984) ("While the statutory authority in the Steelworkers case was section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), we have extended the same presumptions in favor of arbitration to commercial contracts outside the labor field . . . .").

    investment evaluation.  The nature and scope of any Other
    Services provided to Client by FAM will be determined by
    them separately.

(Investment Management Agreement ¶ 1.)   According to the
plaintiffs, all of their claims relate to "Other Services," which
are subject to "separate[]" terms and conditions not including the
Investment Management Agreement's arbitration clause. (Investment
Management Agreement ¶ 1(b).)  The defendants respond that all of
the plaintiffs' investments were part of the plaintiffs' "Account."
(Defs.' Reply at 2.)   Both arguments are problematic.   The
defendants have not cited any support for their assertion that the
Scattered Loan was part of the "Account" that FAM managed.  And
even assuming that the loan participations constituted "Securities"
as the Investment Management Agreements define that term, there is
no indication in the complaint that FAM exercised its discretionary
authority to acquire them *on behalf of* Legacy Re, Rock Solid,
and/or Ferenc.  Instead, it appears that the plaintiffs, acting on
FAM's advice, purchased the loan participations on their own
behalf. (See Compl. ¶¶ 14-15.) On its face, then, FAM's role with
respect to the Scattered Loan transaction appears to have been in
the nature of "investment evaluation."   (Investment Management
Agreement ¶ 1(b).)  On the other hand, the plaintiffs' claims are
not based solely on the Scattered Loan transaction.  Ferenc's claim
against FAM in Count III is based in part on fees that FAM charged
him "for managing a bond portfolio . . . ." (Id. at ¶ 46; see also

id. at ¶ 12 ("Among other things, an account was established by FAM at Bear Stearns, in the name of or for the benefit of Ferenc, over which FAM had discretionary trading authority.").) The plaintiffs' other claims also suggest, albeit less explicitly, that they are based at least in part on "Account" services. In Count I, Legacy Re and Rock Solid ask us to compel FAM and Brenner to disgorge "performance" and other fees that they paid to FAM in connection with the Scattered Loan transaction and "additional investments." (Compl. ¶ 28.) This allegation appears to refer to the "performance fee" set forth in the Investment Management Agreements. (See Investment Management Agreement § 7 (requiring the plaintiffs to pay FAM a "performance fee" based upon a percentage of profits derived from assets in the Account).) The plaintiffs have not identified any other agreement requiring them to pay a "performance fee" to FAM.

Ultimately, we conclude that it is unnecessary to categorize each of the plaintiffs' claims — "Account" versus "Other Services" — against FAM. First, we do not read the "Other Services" section of the Investment Management Agreements to expressly exclude any disputes from arbitration. Cf. Warrior & Gulf Nav., 363 U.S. at 584-85 (noting that the parties may expressly provide that particular disputes are not subject to arbitration). It simply indicates that the parties will separately determine the "nature and scope" of those services. They might agree that disputes

concerning certain services would not be subject to arbitration, but there is no evidence that they did.  See AT&T Tech., 475 U.S. at 650; Warrior & Gulf Nav. Co., 363 U.S. at 584-85.  Second, the Investment Management Agreements supply an essential term for "Other Services:" FAM's fee.  (See Investment Management Agreements at C-1 ("Other services will be compensated at an hourly rate of $350 plus a 15% nonaccountable overhead charge.").)  In that sense, a claim based upon FAM's performance of "Other Services" is a claim "with respect to" the Investment Management Agreements.  The plaintiffs' reliance on Rosenblum v. Travelbyus.com Limited, 299 F.3d 657 (7th Cir. 2002) is misplaced.  In Rosenblum, the Court held that an arbitration clause in an employment agreement did not encompass disputes concerning a related acquisition agreement.  Id. at 663.  It was clear from the language of the two contracts that they concerned separate subjects and that each agreement was complete in its own right.  Id.  Here, the Investment Management Agreements create a general framework for all of the parties' transactions — "Account" and non-"Account" — and establish the fees for FAM's services depending on the nature of the transaction.  In sum, there is no "forceful evidence" indicating that the parties intended to exclude the plaintiffs' claims in Counts I and III from the scope of the arbitration clauses.  AT&T Tech., 475 U.S. at 650.

**b.  Counts I and III Against Brenner and Plaintiffs' Motion to Strike**

- 12 -

The plaintiffs argue that Brenner cannot compel them to submit to arbitration because, unlike FAM, she is not a party to the Investment Management Agreements. She executed the agreements, but she did so as FAM's "President." (See Investment Management Agreements at 12.) Brenner argues that she is entitled to enforce the provision under two theories: (1) equitable estoppel, and (2) agency. Before addressing the substance of Brenner's arguments, we note that the parties disagree about the governing law. The defendants relied on Illinois authorities in their opening brief, (see Def.'s Mem. at 6), and the plaintiffs followed suit in their response. (See Pls.' Resp. at 6-7.) In their reply memorandum, the defendants argued for the first time that California law is controlling pursuant to the choice-of-law provision in the Investment Management Agreements. (See Defs.' Reply at 7-8; see also Investment Management Agreement § 27 (providing that the agreements shall be governed by California law).) The plaintiffs have moved to strike the defendants' reply brief insofar as it is predicated on this new argument. (See Mot. to Strike at 2.) According to the plaintiffs, the choice of law is critical because Brenner's equitable-estoppel theory is not viable under Illinois law. (See id.; see also Pls.' Resp. at 6-7 (citing Ervin v. Nokia, Inc., 812 N.E.2d 534, 542 (Ill. App. Ct. 2004); Defs.' Reply at 7 ("Defendants' concede that under the laws of Illinois, Brenner may

be unable to compel arbitration pursuant to the principle of equitable estoppel.").)

However, the law in both jurisdictions supports Brenner's alternative theory that she is entitled to enforce the arbitration clause as FAM's agent. Under Illinois and California law, "an agent acting within the scope of his agency is entitled to invoke an arbitration agreement entered into by [his] principal." Ellis v. Coventry Capital I LLC, No. 08 CV 3083, 2008 WL 4396349, *7 (N.D. Ill. Sept. 24, 2008) (applying Illinois law); see also RN Solution, Inc. v. Catholic Healthcare West, 81 Cal.Rptr.3d 892, 900 (Cal. Ct. App. 2008) (similar). The plaintiffs are suing Brenner for actions she undertook as FAM's agent. (See Compl. ¶¶ 13 ("Brenner was a subagent employed by FAM and owed to Ferenc the same fiduciary duties owed to him by FAM."); 28 ("Legacy Re and Rock Solid paid to FAM 'performance' or other fees for its services and advice, which FAM in turn paid over to Brenner, in whole or in part.").) Therefore, she is entitled to enforce the arbitration clause in the Investment Management Agreements under both Illinois and California law. The plaintiffs' motion to strike is denied as effectively moot.

Finally, the plaintiffs' reliance on McCarthy v. Azure, 22 F.3d 351, 356-361 (1st Cir. 1994) does not persuade us to reach a different result. (See Pls.' Resp. at 8.) The McCarthy court rejected a non-party agent's attempt to enforce an arbitration

- 14 -

clause in a purchase agreement that he executed on his principal's behalf. McCarthy, 22 F.3d at 357. First, the court was not applying Illinois or California law.[4] The law in those jurisdictions is consistent with the authorities that McCarthy distinguished and/or rejected. See id.; see, e.g., Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121-22 (3d Cir. 1993). Second, the court expressly distinguished cases, like this one, involving service contracts: "[a] person who enters into a service contract with a firm contemplates an ongoing relationship in which the firm's promises can only be fulfilled by future (unspecified) acts of its employees or agents stretching well into an uncertain future. A person who contracts to transfer assets to a company faces a much different prospect: a one-shot transaction in which the purchaser's obligations are specified and are, essentially, performed in full at the closing, or soon thereafter. So it is here." Id. at 357. Unlike the purchase agreement in McCarthy, the Investment Management Agreements are service contracts. See CD Partners, LLC v. Grizzle, 424 F.3d 795, 799-800 (8th Cir. 2005) (distinguishing McCarthy on the grounds that that case involved a "one-shot" transaction); Lamson v. LFG, LLC, No. 00 C 3094, 2000 WL 33539382, *1 (N.D. Ill. June 22, 2000)

---

[4] The McCarthy court applied federal common law. See McCarthy, 22 F.3d at 355. We believe that the Seventh Circuit would apply state law to this question. See Stone, 328 F.3d at 345 (concluding that state law governed disputes about the scope and meaning of an arbitration clause, and that federal law only comes into play if the state has adopted "special rules" for arbitration inconsistent with federal policy).

- 15 -

(similar). Brenner's performance as FAM's agent over the course of the parties' business relationship is at the heart of the plaintiffs' complaint. (See Compl. ¶¶ 11-15, 19, 21-25, 28, 44-47 (alleging that "Brenner and FAM" provided dubious investment advice to the plaintiffs).)

In sum, Counts I and III — asserted by Legacy Re, Rock Solid, and Ferenc against Brenner and FAM — are subject to arbitration in their entirety.

### 3.    407 Dearborn's Claims as Against Brenner and FAM (Count II)

In Count II, 407 Dearborn alleges breach of fiduciary duty by Brenner, FAM, and Horrell.  Brenner and FAM argue that 407 Dearborn, which is not a party to the Investment Management Agreements, is nevertheless bound by the arbitration clause because the company was "formed as part of the work-out facilitated by FAM when the Scattered Loan defaulted." (Defs.' Mem. at 5.) However, they have not cited any relevant authority supporting the proposition that a non-party may be compelled to arbitrate its claims simply because it participated in transactions with parties bound by an arbitration clause.  In their reply brief, the defendants belatedly cite JSM Tuscany, LLC v. Superior Court, 123 Cal.Rptr.3d 429, 443-44 (Cal. Ct. App. 2011) for the proposition that a non-party plaintiff may be bound by an arbitration clause under equitable-estoppel principles if it sues for breach of a contract containing such a clause.  But 407 Dearborn's claims are

- 16 -

not even loosely based upon the Investment Management Agreements. Instead, 407 Dearborn alleges that the defendants enriched themselves at the company's expense during the time period when they controlled the company (March 2009 through June 2011). (See Compl. ¶¶ 33-40.) We conclude that 407 Dearborn's claims in Count II are not subject to arbitration.

**4. The Plaintiffs' RICO Claim as Against Brenner (Count IV)**

In Count IV, Ferenc, Legacy Re, and Rock Solid allege that Brenner and Horrell violated 18 U.S.C. § 1962(c) and (d). Insofar as this claim is brought against Brenner, we conclude that it is subject to arbitration. The sufficiency of the plaintiffs' complaint is beyond the scope of the defendants' motion,[5] but Count IV appears to be yet another instance of a "garden-variety" business dispute masquerading as a civil RICO claim for treble damages. Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1025 (7th Cir. 1992). ("While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour."). The complaint does not identify any other

---

[5] See AT&T Tech., 475 U.S. at 649-50 ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.").

victims of the alleged RICO conspiracy besides Ferenc and his companies. And although the complaint vaguely refers to "other investments," (Compl. ¶ 54), the only allegations that the plaintiffs have pled with even minimal detail are the same allegations underlying Counts I and III.[6] Moreover, given the breadth of the arbitration clause, it seems likely that the "other investments" are likewise subject to that clause. (See supra.) We conclude that the plaintiffs' RICO claim against Brenner is a claim "with respect to" the Investment Management Agreements and therefore subject to arbitration.

Horrell, who is also named as a defendant in Count IV, is neither a party to the Investment Management Agreements nor an agent of a party to those agreements. However, we cannot override Brenner's right to arbitration because the plaintiffs' RICO claim involves a nonparty: "[u]nder the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." Moses H. Cone Memorial Hosp., 460 U.S. at 20; see also Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985) ("[T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties

---

[6] Ferenc, Legacy Re, and Rock Solid also allege losses stemming from "the improper transfer of property from 407 Dearborn," (see Compl. ¶ 59), but they are not the real parties in interest to such a claim. That claim belongs to 407 Dearborn. See, e.g., Freed v. JPMorgan Chase Bank, N.A., No. 12 C 1477, 2012 WL 6193964, *4 (N.D. Ill. Dec. 12, 2012).

files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.").

**B.    Horrell's Motion to Dismiss**

**1.    Legal Standard**

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits.   5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1356, at 354 (3d ed. 2004).   To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'   A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 556 (2007)).   When evaluating a motion to dismiss a complaint, the court must accept as true all factual allegations in the complaint.   <u>Iqbal</u>, 129 S. Ct. at 1949. However, we need not accept as true its legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555).

- 19 -

### 2. 407 Dearborn's Breach of Fiduciary Duty Claim Against Horrell (Count II)[7]

Horrell argues that 407 Dearborn's breach of fiduciary duty claim is subject Rule 9(b)'s heightened pleading standard. See Robinson v. Caster, 356 F.2d 924, 925 (7th Cir. 1966) ("A breach of fiduciary duty claim premised on fraud is subject to Rule 9(b)."). Although it is a close question, we conclude that Count II does sound in fraud. The plaintiffs allege that from March 2009 through June 2011 407 Dearborn "was controlled and managed by Brenner, FAM and/or Horrell (directly or indirectly through 407 Dearborn Manager, LLC)." (Compl. ¶ 19; see also id. at ¶ 33 ("From March, 2009 through June, 2011, 407 Dearborn was controlled and dominated by Brenner, FAM and Horrell.").) According to the plaintiffs, Brenner and FAM caused 407 Dearborn to pay dubious and excessive management fees to Horrell and/or his affiliates. (Compl. ¶¶ 34, 37.) They also allege that "Brenner, FAM, and/or Horrell" caused 407 Dearborn to accept and repay loans from the defendants' affiliates at exorbitant interest rates. (Id. at ¶ 35.) In paragraph 37, 407 Dearborn alleges that the defendants caused it to make payments to Horrell and his affiliates without disclosing (or inadequately disclosing) improper mark-ups and other excessive charges. (See id. at ¶ 37.) Indeed, the complaint indicates that

---

[7] Although not labeled as such, it is apparent from the complaint and from the plaintiffs' response to Horrell's motion that Count II alleges breach of fiduciary duty.

Horrell received some payments without conferring any benefits on 407 Dearborn. (See id.; see also id. at ¶ 34 (indicating that Horrell received purported "management fees" when, in fact, the property was managed by another party).) In essence, 407 Dearborn alleges that the defendants were siphoning money out of the company on the pretense that the defendants and/or their affiliates were providing valuable services. We think that 407 Dearborn is alleging fraud, not simple mismanagement or conflict of interest. Our conclusion is buttressed by the fact that the other plaintiffs' RICO fraud claim is purportedly based in part upon 407 Dearborn's losses. (See Compl. ¶ 59 (alleging that the scheme to defraud caused losses "including but not limited to . . . the improper transfer of property from 407 Dearborn.").

Rule 9(b) requires plaintiffs to allege the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990); see also Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co., 631 F.3d 436, 442 (7th Cir. 2011) (noting that "the requisite information — what gets included in that first paragraph — may vary on the facts of a given case"). Count II is vague concerning nearly all of these particulars. Some allegations indicate that Horrell exercised direct control over 407 Dearborn, (see Compl. ¶ 19), but how? Did

Horrell have an interest in 407 Dearborn?  Or 407 Dearborn Manager,
LLC?   Other allegations indicate that Horrell was actually an
outsider with personal and/or professional ties to Brenner.  (See
id. at ¶¶ 34, 36, 38, 40.)  In addition, the time frame for the
alleged improper transfers is overbroad: March 2009 through June
2011.  (See id. at ¶ 33.)  407 Dearborn has not identified any
particular improper loan (see id. at ¶ 35), or any particular
invoice containing "mark-ups or other excessive charges . . . ."
(Id. at ¶ 38.)  407 Dearborn's vague allegations of impropriety
against Horrell do not pass muster under Rule 9(b).  See Pirelli
Armstrong, 631 F.3d at 442 ("Heightened pleading in the fraud
context is required in part because of the potential stigmatic
injury that comes with alleging fraud and the concomitant desire to
ensure that such fraud allegations are not lightly leveled.").
Horrell's motion to dismiss Count II is granted.  And because the
defects we have identified apply equally to 407 Dearborn's claim
against Brenner and FAM, we will dismiss count II against those
defendants as well under Rule 12(b)(6).

### 3.   Civil RICO (Count IV)

The plaintiffs have filed a RICO conspiracy claim against
Horrell and Brenner.  18 U.S.C. § 1962 states in pertinent part:

> (c) It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity ....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c) & (d). The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006). "[A]llegations of fraud in a civil RICO complaint are subject to the heightened pleading standard of Fed.R.Civ.P. 9(b), which requires a plaintiff to plead all averments of fraud with particularity." Slaney v. The Intern. Amateur Athletic Federation, 244 F.3d 580, 597 (7th Cir. 2001).

a. Enterprise

"A RICO complaint must identify the enterprise." Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 645 (7th Cir. 1995). "The hallmark of an enterprise is a structure." Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 645 (7th Cir. 1995) (citation and internal quotation marks omitted). "An enterprise is distinct, separate, and apart from a pattern of racketeering activity: although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does." Jennings v. Emry, 910 F.2d 1434, 1440 (7th Cir. 1990).

The plaintiffs purport to allege an association-in-fact enterprise consisting of "FAM, Fortuna Stream, and other entities in which Brenner and Horrell held or controlled the interests."

(Compl. ¶ 51.) This "nebulous" collection of named and unnamed entities is insufficient to state a civil RICO violation. <u>See Richmond</u>, 52 F.3d at 645 (rejecting a similar allegation as too "nebulous" and "open ended" to addequately plead an association-in-fact). Also, there is no suggestion of any structure or hierarchy. <u>Limestone Development Corp. v. Village of Lemont, Ill.</u>, 520 F.3d 797, 804-05 (7th Cir. 2008) ("Nowhere in the complaint does one find anything to indicate a structure of any kind. There is no reference to a system of governance, an administrative hierarchy, a joint planning committee, a board, a manager, a staff, headquarters, personnel having differentiated functions, a budget, records, or any other indicator of a legal or illegal enterprise."). Instead, the complaint merely describes a loose confederation of entities that "solicit from investors monies to be used by and for the benefit of various entities and/or projects in which Brenner and Horrell have an interest, and from which they receive fees and profits." (Compl. ¶ 52); <u>cf.</u> <u>Jennings</u>, 910 F.2d at 1440 ("[A]n enterprise is defined by what it is, not what it does."). We conclude that the plaintiffs have failed to adequately allege a RICO enterprise.

    *b. Pattern of Racketeering Activity*

  "[A] pattern of racketeering activity consists, at a minimum, of two predicate acts of racketeering (committed within a ten-year time period)." <u>Slaney</u>, 244 F.3d at 598-99. Here, the plaintiffs allege that the defendants committed multiple acts of mail fraud.

- 24 -

Therefore, with respect to at least two such acts, they "must allege the identity of the person who made the representation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." <u>Id.</u> at 599. The complaint contains a table listing 21 letters that "Brenner and FAM mailed to Ferenc, Legacy Re, and/or Rock Solid." (Compl. ¶ 54.) The complaint does not specify which plaintiffs received which letters from which defendants. Most of the communications — 16 of 21 — are described as "cover letters" enclosing financial statements for Fortuna Stream. (<u>Id.</u>) The plaintiffs do not explain why they believe that the letters and/or the financial statements furthered the alleged scheme. The same goes for the three invoices for consulting and performance fees. (<u>Id.</u>) Finally, two communications are described only as "Letter dated __," (<u>id.</u>), which is plainly insufficient under Rule 9(b).

As we indicated earlier in connection with Brenner's and FAM's motion to compel arbitration, we take a dim view of the plaintiffs' RICO claim. Although the plaintiffs vaguely allude to "other investments," (Compl. ¶ 54; <u>see also</u> <u>id.</u> at ¶ 44), their complaint is largely predicated on the fallout from one bad business deal. This is a flimsy basis for seeking treble damages under the civil RICO statute. <u>See</u> <u>Midwest Grinding</u>, 976 F.2d at 1025. Horrell's motion is granted as to Count IV.

## **CONCLUSION**

- 25 -

The plaintiffs' motion to strike [29] is denied.  Because the arbitration provision in the Investment Management Agreements designates an arbitral forum outside this district, we will convert Brenner's and FAM's motion to compel arbitration [21] into a motion to dismiss for improper venue.  That motion [21] is granted in part and denied in part.  We conclude that the plaintiffs' claims against Brenner and FAM in Counts I, III, and IV of the complaint are subject to arbitration in Orange County, California.  Accordingly, we dismiss those claims against Brenner and FAM for improper venue pursuant to Rule 12(b)(3), without prejudice to the plaintiffs refiling those claims in the appropriate forum.  We conclude that Count II is not subject to arbitration.  However, Count II is dismissed as to all the defendants, without prejudice, pursuant to Rule 12(b)(6).  Finally, Count IV against Horrell is dismissed without prejudice pursuant to Rule 12(b)(6).  A status hearing is set for March 6, 2013 at 11:00 a.m.


DATE:       February 21, 2013

ENTER:      _____

            John F. Grady, United States District Judge